ALEX WILLIAMS v. THE STATE.

No. 3476.   Decided March 17, 1915.

1.—Murder—Charge of Court—Objections.

Where the record did not show when the requested charges were presented, the same can not be considered in the absence of a bill of exceptions under the law as it now stands; besides, the court correctly refused them.

2.—Same—Sufficiency of the Evidence.

Where, upon trial of murder assessing the death penalty, the evidence was sufficient to sustain the conviction, there was no reversible error.

3.—Same—Murder—Statutes Construed—Express and Implied Malice—Death Penalty.

Under the murder statute abolishing the two degrees of murder, the death penalty can be inflicted even when the evidence does not show express malice, but shows beyond a reasonable doubt an unlawful killing with malice aforethought, whether that malice is express or implied. The punishment is left to the jury and ranges from imprisonment for five years to and inclusive of the death penalty.

Appeal from the District Court of Marion.   Tried below before the Hon. H. F. O'Neal.

Appeal from a conviction of murder; penalty, death.

The opinion states the case.

*R. R. Taylor*, for appellant.—On question of murder in first degree: Primus v. State, 2 Texas Crim. App., 369; Tooney v. State, 5 id., 163; Sharpe v. State, 17 id., 486; Gonzales v. State, 19 id., 394; Giles v. State, 23 id., 281; Reyons v. State, 32 Texas Crim. Rep., 151; Farrer v. State, 42 Texas, 265.

*C. C. McDonald*, Assistant Attorney General, for the State.

PRENDERGAST, Presiding Judge.—Appellant was convicted of the murder of Henry Terhune, and the death penalty was assessed.

It will be unnecessary to give in detail the testimony of the several witnesses. We will give a succinct statement which the evidence was amply sufficient to establish.

All the parties were negroes. Henry Terhune had "kept" Savannah Parker, a lewd woman, for a number of years, till about two years prior to the killing. Alex Williams, appellant, succeeded him and "kept" her for the next two years just prior to the killing. For most of the time during these last two years Terhune had been away from Jefferson, where appellant and Savannah lived. The killing occurred over this woman. She began to show her preference for Terhune and go back to her first love and cast appellant off shortly before the killing. The killing occurred in the early part of a bright moonlight night. Savannah intended going that night to sit up with a corpse. Appellant called at her house while she was at supper, claiming he had a "date" with her, and sat out on her front gallery. After his arrival a negro woman, Alcey Terry, also arrived at Savannah's house. Just before they got ready to leave Terhune also appeared at her house. He stopped at her gate a few feet from her gallery, didn't go inside. He was in his shirt-sleeves. When he arrived he and appellant quietly and apparently friendly, spoke to one another. Savannah asked Terhune if he had come after some pears that had been left there for him. He said not. They then started out to go to where the corpse was. Terhune, still at the gate, opened it for the others to pass out, which they did. The woman Alcey in front, Terhune next, Savannah next and appellant in the rear,—all walking along in a path single file going from Savannah's toward Mary White's house, only seventy feet distant. Appellant said Savannah started off with Terhune. The testimony shows that while thus walking in the path single file, Terhune said apparently to Alcey, in substance, that something was in the path, he would kick it out. Appellant's house was some 175 feet distant from Savannah's house and in front of Mary White's, 170 feet therefrom. Just after leaving Savannah's house and before any of the parties reached Mary White's appellant, without saying anything, left the others and went directly to his house, got his loaded shotgun, supplied himself with loaded shells, and immediately went towards deceased. In the meantime, the other two women and deceased had reached Mary White's. Savannah went in and asked Mary White for a pin which she needed and got to fasten her dress. The other woman, Alcey, and deceased, passed just beyond Mary White's gate and were waiting for Savannah to come back before proceeding. Just as Savannah came out of Mary White's appellant approached from his house, stopped about fifty feet from where deceased and Alcey were standing, and threw his gun down on deceased. Savannah holloed to him twice not to shoot or not to kill that man. Appellant said to deceased, "Mr. Henry, I understand you say that you would kick me out of the path," or "didn't I understand you to say that you would kick me out of the path," or "knock me out of the path," and nothing more. Deceased said nothing in reply and did nothing, and appellant immediately shot him. The shot from the first fire hit the deceased about the ankle with small shot. Appellant at once ejected the fired shell, reloaded and at once fired the second shot, hitting the deceased in the body and killing him instantly. When

the first shot was fired, deceased ran back towards Savannah's house. The second shot struck him just as he got opposite Mary White's gate and he fell in front of her gate and died immediately. As soon as said two women, .Alcey and Savannah, saw and heard the shooting, they ran back past Savannah's house to a neighbor's, some 225 feet further, and both got under the bed to hide from appellant. As they started off appellant said, in substance, to Savannah that he intended to shoot or kill her, too. He followed the two women up to the house where they had got under the bed. Appellant's son came to him there and took him away. He then fled to escape arrest and some days later was caught by the officers in another county to which he had fled. Mary White and others testified that they saw and heard the whole thing from immediately before the shooting until it was over with. Mary White said deceased said nothing whatever at any time; that he made no motion with his hands in any way as if to get or draw any weapon whatever; that when appellant first shot him, he started to run the same way the women did, and did take several steps when the appellant fired a second shot which resulted in his immediate death, deceased falling at her front gate. The uncontradicted testimony shows that the employer of the deceased, a white man, very soon after the killing, arrived at the deceased's body, before any other, and he with others thoroughly searched the body and pockets of the deceased, and told what all they found in the several pockets, but that the deceased had no arms of any kind,—not even a pocketknife; that after making this complete search of his body he had the body removed to Savannah's house to prepare the body for burial. He himself, with the officers, then went to hunt the appellant but could not find him; that about three hours later he came back to the body of the deceased with the undertaker and they then, for the first time, found an old pocketknife closed and in one of the pockets of the deceased. He was positive this knife nor any other was in the pocket of the deceased, or on him anywhere when he first searched the body and had it removed to Savannah's. It was shown clearly that appellant was not nearer than about fifty feet of the deceased when he first shot, and that at the second shot he stepped up only a few feet nearer to him. Both empty shells from appellant's gun were found at this location; that as soon as appellant killed the deceased he started straight after the two women with his gun and followed them to where they had gone to a neighbor's and hid under the bed as stated.

Appellant's defense was self-defense. He testified that when he approached deceased, threw his gun down on him and said what he did about kicking him out of the path, that the deceased at once threw his hand back to his hip pocket, where he, appellant, thought he had a pistol, and he thought deceased was going to draw the pistol and shoot him, and he shot deceased in self-defense. The circumstances disprove this and the disinterested eyewitnesses swore positively to the contrary. Appellant also swore that he met the deceased the morning of the day

before the killing that night, and that deceased then forbade him from going to see said Savannah and threatened that if he did he would kill him. He also claimed that Savannah's son-in-law, Thomas, told him that same day that deceased threatened to kill him if he didn't let Savannah alone. The proof showed that said Thomas died before this trial, and, of course, appellant had killed the deceased before then. The circumstances and all the evidence would justify the jury to disbelieve, as they did, appellant's said testimony. In fact, all the circumstances indicated the reverse as the truth. However, this testimony by appellant raised these issues, and the court submitted self-defense independently, and self-defense in connection with threats, fully to the jury in his charge, to which there is no complaint whatever by appellant, and the jury found against him.

Appellant made no exception in any particular to the court's charge. He requested two special charges, but when they were requested is not shown and he took no bill of exceptions to the refusal of the court to give either of them. Under the law, as it now is, the refusal of the court to give these charges is not raised in such a way that we could consider them, but we have considered them, and the court correctly refused to give either of them.

The only other question raised by appellant is that he claims the evidence is insufficient to authorize the jury to assess the death penalty against him.

When our law provided for two degrees of murder,—first and second— it authorized the death penalty to be inflicted only when express malice was shown. It occurs to us the evidence in this case was sufficient to show express malice and even under the old law to have authorized the infliction of the death penalty. But by the amended Act of 1913 the Legislature expressly did away with the two degrees of murder, and unquestionably, under the new law, the death penalty can be inflicted even when the evidence does not show express malice. In other words, our law of murder, as it now is, authorizes the jury to assess the death penalty when the evidence is sufficient to show beyond a reasonable doubt an unlawful killing with malice aforethought, whether that malice is expressed or implied. It also now authorizes the jury to inflict the punishment for any term of years, as low as five, where the evidence even should unquestionably show express malice. In all events, the punishment for murder is left to the jury. This court has no power or authority to fix the punishment. If the evidence is sufficient to justify the jury to believe, beyond a reasonable doubt, that the killing is with malice aforethought and unlawful, they are clearly authorized to assess the death penalty.

In our opinion the evidence in this case was amply sufficient to show an unlawful killing with malice aforethought, and we are not authorized under the law to disturb the verdict because the jury assessed the death penalty.

This being a death penalty case, we have read and studied it care-

fully.    No error is shown in the trial and we can not do otherwise than order the judgment affirmed, which is done.

'*Affirmed.*